WILLIAM L. GLASS *et al.*, Plaintiffs-Appellants, v. BARRY PITLER *et al.*, d/b/a Pitler and Mandell, Defendants-Appellees.

First District (5th Division)    No. 1—93—3828

Opinion filed November 3, 1995.

Dan Walker, Jr., of Cesario & Walker, of Hinsdale, for appellants.

John J. O'Malley and William G. Skalitzky, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiffs appeal from the trial court's order granting summary judgment to defendants. Plaintiffs' amended four-count complaint for legal malpractice sought damages based on theories of negligence (count I), wilful and wanton conduct (count II), intentional misconduct (count III), and breach of contract (count IV).

Plaintiffs, William L. Glass and Carol L. Glass,[1] instituted the instant legal malpractice action against the defendants, Barry Pitler and Philip Mandell, who practiced law under the firm name of Pitler and Mandell. Plaintiffs alleged that they sought legal advice from Pitler and Mandell on the issue of whether their pension funds, held in an ERISA-qualified[2] defined benefit pension plan and trust, would be subject to claims of personal or corporate creditors of plaintiffs' proposed business venture, W.G. James, Inc. (WGJ, Inc.) Plaintiffs

---

[1]For purposes of this opinion, plaintiff William L. Glass will be referred to as Glass. Plaintiff Carol L. Glass will be referred to by her full name.

[2]ERISA is the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq. (1988)).

further alleged that, on or about August 1, 1984, and on at least five separate occasions thereafter, the defendants gave "assurances and guarantees" that the pension plan would not be subject to creditors of the new business venture. Plaintiffs stated that, in reliance on defendants' representations, plaintiffs incorporated the new venture under the name of W.G. James, Inc., on August 14, 1984, and incurred personal liability as guarantors for WGJ, Inc.

In his deposition, Glass stated that in 1988 plaintiffs were sued by Fidelity and Guaranty Co. of Maryland (Fidelity) on personal guaranties they signed on behalf of WGJ, Inc., and by La Salle Bank Northbrook (La Salle Bank) to collect on an outstanding loan to WGJ, Inc., which had been secured in part by an assignment of beneficial interest on plaintiffs' home. According to Glass, the plaintiffs owed over $3.4 million to Fidelity and approximately $1.1 million to La Salle Bank. The Glasses' major assets were their home, valued at $700,000, and their pension fund, valued at $1 million in 1989. (With respect to the pension plan, Glass was the sole shareholder and officer of Construction Specialties, Inc., the settlor of the pension plan; Glass was the trustee of the pension plan; and both Glasses were the beneficiaries of the plan. The plaintiffs contended that the provisions of the pension plan allowed Glass to access all or part of the pension funds by terminating his employment, terminating the plan, withdrawing his voluntary contributions or receiving a loan.) Glass stated that in 1988 he consulted a bankruptcy attorney and was advised that filing for bankruptcy relief would subject the pension fund assets to the corporate creditors' claims.

Glass also testified in his deposition that, on June 16, 1989, one week before plaintiffs' home was to be sold at a Uniform Commercial Code sale pursuant to the assignment of beneficial interest held by La Salle Bank, La Salle Bank's $1.1 million claim was settled for $759,318.03 plus interest. Glass stated that he was forced to deplete his pension funds to pay the La Salle Bank settlement of $770,000 plus taxes and Internal Revenue Service penalties. He further stated that on April 26, 1990, Fidelity obtained a judgment in excess of $3 million against the plaintiffs and that this claim was settled on October 31, 1990, for $300,000. The proceeds to pay that settlement amount and associated fees were obtained by mortgaging his home for $400,000.

The plaintiffs contend that but for defendants' representations in 1984 that plaintiffs' pension funds would not be subject to creditors' claims, plaintiffs would not have undertaken the risks involved in the operation of WGJ, Inc. The plaintiffs further contend that, as a result of the incorrect legal advice they received from the defendants,

they were forced to deplete those pension funds in 1989 because their pension funds would not have been protected in bankruptcy proceedings.

A brief discussion of the treatment of ERISA-qualified pension plans under bankruptcy law during the period of 1984 to 1989[3] is relevant to the case at bar. Prior to 1992, when the United States Supreme Court in *Patterson v. Shumate* (1992), 504 U.S. 753, 119 L. Ed. 2d 519, 112 S. Ct. 2242, held that ERISA-qualified pension plans were excluded from the debtor's bankruptcy estate under section 541(c)(2) of the United States Bankruptcy Code (11 U.S.C.A. § 541(c)(2) (West 1993)), there was a split of authority on that issue. In 1983, the bankruptcy court in the northern district of Illinois held in *In re Di Piazza* (N.D. Ill. 1983), 29 Bankr. 916, that an ERISA-qualified pension or profit sharing plan which contained anti-alienation clauses but which permitted the debtor to reach the corpus at any time did not constitute a type of spendthrift trust under Illinois law which the Bankruptcy Code excepted from inclusion in the debtor's estate. (For a pension plan to qualify as a traditional spendthrift trust under Illinois law, the debtor must show that he cannot alienate his interest in the trust *res* and that he does not possess exclusive and effective control over termination and distribution. (*In re Dagnall* (C.D. Ill. 1987), 78 Bankr. 531, 534.) In reaching that decision, the *Di Piazza* court relied upon *In re Graham* (N.D. Iowa 1982), 24 Bankr. 305, which held that where the debtor was trustee of the pension plan and sole shareholder, director and officer of the corporation creating the plan, the pension plan was not a spendthrift trust and thus was includable in the debtor's bankruptcy estate. *In re Graham* was affirmed by the Court of Appeals for the Eighth Circuit. (*In re Graham* (8th Cir. 1984), 726 F.2d 1268.) Holdings in accord with *Di Piazza* and *Graham* also were reached by the Fifth, Ninth and Eleventh Circuits for the United States Courts of Appeals, by the United States Bankruptcy Court for the Central District of Illinois, and by numerous other bankruptcy courts. (*In re Daniel* (9th Cir. 1985), 771 F.2d 1352; *In re Lichstrahl* (11th Cir. 1985), 750 F.2d 1488; *In re Graham* (8th Cir. 1984), 726 F.2d 1268; *In re Goff* (5th Cir. 1983), 706 F.2d 574; *In re Dagnall*, 78 Bankr. 531; *In re Sundeen* (C.D. Ill. 1986), 62 Bankr. 619. See *In re Dagnall* for list of cases holding that traditional spend-

---

[3]According to the plaintiffs, section 12—1006 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 12—1006 (now 735 ILCS 5/12—1006 (West 1994))) was amended to exempt ERISA pension funds from bankruptcy in cases filed after August 30, 1989. See *In re Balay* (N.D. Ill. 1990), 113 Bankr. 429.

thrift trusts are protected under section 541(c)(2) of the Bankruptcy Code.) At the times relevant to the instant appeal, the issue had not been reached by the United States Court of Appeals for the Seventh Circuit. See *Employee Benefits Committee v. Tabor* (S.D. Ind. 1991), 127 Bankr. 194, 197.

Defendants in the case at bar characterize the above cases, cited by the plaintiffs in their response to defendants' motion for summary judgment and on appeal, as cases premised on the legislative history interpretation of section 541(c)(2) of the Bankruptcy Code. They argue that under another "school of thought," which they characterize as the plain meaning approach, adopted by other courts including, ultimately, the United States Supreme Court in *Patterson v. Shumate*, a debtor's interest in an ERISA-qualified plan or trust could be excluded from his bankruptcy estate, regardless of whether it qualified as a spendthrift trust, if the plan or trust contained alienation restrictions enforceable against general creditors. (See *In re Ralstin* (D. Kan. 1986), 61 Bankr. 502; *Warren v. G.M. Scott & Sons* (S.D. Ohio 1983), 34 Bankr. 543.)[4] The defendants argue that, under this interpretation, the plaintiffs' pension plan would have been excluded from their estate had they sought bankruptcy relief in 1989.

At the hearing on their motion for summary judgment, the defendants initially argued that they were not bankruptcy attorneys, that the plaintiffs did not seek bankruptcy advice from them, and that the advice they did give the plaintiffs, namely, that the plaintiffs' pension funds could not be attached or garnished by creditors, was correct. The defendants argued, alternatively, that even under bankruptcy law, under the plain meaning approach, the plaintiffs' pension funds would have been protected from their creditors' claims. As a third argument, defendants contended that the plaintiffs, by voluntarily settling their creditors' claims, could not establish that the loss of their pension funds was proximately caused by the defendants' alleged negligent actions. It is this third argument that became the basis of the summary adjudication by the trial court, and it is the issues raised by this latter argument that will be addressed in this appeal.

A motion for summary judgment may be granted when "the

---

[4]The defendants also cite *In re Lucas* (6th Cir. 1991), 924 F.2d 597, and *In re Moore* (4th Cir. 1990), 907 F.2d 1476, as cases that adopted the "plain meaning" rationale. However, since these cases were decided after 1989, they are of no assistance in determining the status of bankruptcy law during the period of 1984 and 1989 except to the extent that they discuss and interpret prior case law.

pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (735 ILCS 5/2—1005 (West 1992); *Torres v. City of Chicago* (1994), 261 Ill. App. 3d 499, 632 N.E.2d 54; *Bartholomew v. Crockett* (1985), 131 Ill. App. 3d 456, 475 N.E.2d 1035.) In ruling on a motion for summary judgment, the trial court must construe the pleadings, depositions and affidavits in the light most favorable to the nonmoving party. (*E.g., First State Insurance Co. v. Montgomery Ward & Co.* (1994), 267 Ill. App. 3d 851, 642 N.E.2d 715; *Stephen v. Swiatkowski* (1994), 263 Ill. App. 3d 694, 635 N.E.2d 997.) If fairminded persons could draw different inferences from the undisputed facts, the issues should be submitted to a jury to determine what inference seems most reasonable. (*E.g., Outboard Marine Corp. v. Liberty Mutual Insurance Co.* (1992), 154 Ill. 2d 90, 607 N.E.2d 1204; *Anglin v. Oros* (1993), 257 Ill. App. 3d 213, 628 N.E.2d 873; *Shanley v. Barnett* (1988), 168 Ill. App. 3d 799, 523 N.E.2d 60.) On appeal, the reviewing court need not accept the trial court's reasons for the judgment and may affirm the judgment upon any ground warranted, regardless of whether the trial court relied upon it and regardless of whether the reason given by the trial court was correct. *Brooks v. Brennan* (1994), 255 Ill. App. 3d 260, 625 N.E.2d 1188; *Shanley v. Barnett*, 168 Ill. App. 3d 799, 523 N.E.2d 60.

■ To establish legal malpractice, a plaintiff must prove the existence of an attorney-client relationship; a duty arising from that relationship; a breach of that duty; a proximate causal relationship between the breach of duty and the damages sustained; and actual damages. (*Metrick v. Chatz* (1994), 266 Ill. App. 3d 649, 639 N.E.2d 198; *Skorek v. Przybylo* (1993), 256 Ill. App. 3d 288, 628 N.E.2d 738.) When an attorney breaches his duty to his client, the attorney is liable for any loss which ensues from that act. (*Zych v. Jones* (1980), 84 Ill. App. 3d 647, 406 N.E.2d 70.) The injuries resulting from legal malpractice are not personal injuries but pecuniary injuries to intangible property interests. (*Gruse v. Belline* (1985), 138 Ill. App. 3d 689, 486 N.E.2d 398.) Damages must be incurred and are not presumed (*Farm Credit Bank v. Gamble* (1990), 197 Ill. App. 3d 101, 554 N.E.2d 779); and the plaintiff must affirmatively plead and prove that he suffered injuries as a result of the attorney's malpractice. (*Sheppard v. Krol* (1991), 218 Ill. App. 3d 254, 578 N.E.2d 212; *Bartholomew v. Crockett* (1985), 131 Ill. App. 3d 456, 475 N.E.2d 1035.) This burden entails establishing that "but for" the attorney's negligence, the client would not have suffered the damages alleged. See *Zych v. Jones*, 84 Ill. App. 3d 647, 406 N.E.2d 70.

In the case at bar, the trial court granted summary judgment to the defendants, finding that the Glasses could not establish that, but for the defendants' advice, they would not have suffered the loss of their pension funds. The court reached this conclusion based on the fact that the plaintiffs settled their creditors' claims and did not file a petition for bankruptcy or obtain a bankruptcy court ruling as to whether plaintiffs' creditors could have reached plaintiffs' pension funds.

■ Subsequent to the trial court's ruling, this division of the First Judicial District of the Illinois Appellate Court, in a case of first impression, held that a plaintiff who settles an underlying claim is not automatically barred from bringing a malpractice action against the attorney who represented him in that claim. (*McCarthy v. Pedersen & Houpt* (1993), 250 Ill. App. 3d 166, 621 N.E.2d 97. Accord *Brooks v. Brennan* (1994), 255 Ill. App. 3d 260, 625 N.E.2d 1188.) In *McCarthy*, the plaintiff brought a legal malpractice action against the defendants who he alleged had negligently represented him in an underlying commercial litigation claim which was settled at trial at the conclusion of the evidence but before the jury returned a verdict. Finding that genuine issues of material fact existed as to whether the defendants were negligent in handling the underlying lawsuit, particularly where the parties disputed the role that plaintiffs' independent counsel played in the settlement, and whether the plaintiff was damaged by that negligence, the court concluded:

> "[O]nly a trial on the merits can fully and fairly resolve the issue of whether an attorney is liable for malpractice despite the fact that the underlying case was settled. To hold otherwise could create ethical problems where an attorney, knowing that he mishandled a case, encourages his client to settle in order to shelter himself from a malpractice claim. The rule espoused here will avoid such conflicts of interest and allow a malpractice claim to succeed or fail on its merits." *McCarthy*, 250 Ill. App. 3d at 172, 621 N.E.2d at 102.

We note that the facts in the instant case are distinguishable from *McCarthy* in that the defendant attorneys did not participate in the settlement of the underlying creditors' lawsuits and did not commit the alleged acts of misconduct during their representation of the plaintiffs in the underlying lawsuits. As a result, the ethical considerations that played a persuasive role in *McCarthy* are nonexistent here. However, the ethical considerations which we recognized in *McCarthy* were not intended as the sole basis for our holding nor do we believe that the holding in *McCarthy* is limited to malpractice claims where the defendant attorney was directly involved in the

underlying lawsuit and settlement thereof. The decisive factor for the denial of summary judgment in *McCarthy* was the existence of disputed facts as to whether the defendants were negligent in handling the underlying case and whether the plaintiffs were damaged by that negligence.

■ While, in accordance with *McCarthy*, settlement of the prior claim will not automatically bar an attorney malpractice action related to that claim, the burden remains on the plaintiff, however, to present genuine issues of material fact as to all elements of the malpractice claim including actual damages. (See *Brooks v. Brennan*, 255 Ill. App. 3d 260, 625 N.E.2d 1188 (summary judgment granted to defendant where plaintiff could not show injury or that she settled for a lesser amount than she could have reasonably expected to recover without the alleged malpractice). *Cf. Sheppard v. Krol*, 218 Ill. App. 3d 254, 578 N.E.2d 212 (action dismissed where plaintiff could not prove actual damages and that would have been successful in underlying action); *Bartholomew v. Crockett*, 131 Ill. App. 3d 456, 475 N.E.2d 1035 (element of actual damages absent where plaintiff's underlying action remained pending against second tortfeasor).) Here, the trial court held that the defendants were entitled to summary judgment because the plaintiffs could not establish actual damages since they settled their creditors' lawsuits and did not obtain a bankruptcy court determination that the pension funds were not protected from their creditors' claims.

Ordinarily, the ascertainment of recoverable damages in a legal malpractice action, once duty and breach of duty have been established, is a factual determination ultimately based upon evidence from which monetary values can be derived. Where those damages result from a plaintiff's inability to prosecute or defend in a prior litigation, the plaintiff would be required to prove what his recovery or liability would have been in that prior matter absent the alleged malpractice. (See *Nika v. Danz* (1990), 199 Ill. App. 3d 296, 556 N.E.2d 873 (in malpractice action based on alleged misconduct in prior litigation, plaintiff must prove "suit within a suit" and establish what the result should have been had underlying action gone to trial absent the misconduct).) In accordance with *McCarthy*, if damages resulting from the legal malpractice action can be otherwise factually established, a judicial determination in the underlying action is not required.

■ In the case at bar, the damages the plaintiffs seek are the losses they sustained as a result of their alleged inability to file a petition for bankruptcy in 1989 based upon their contention that their pension funds would not have been protected in bankruptcy proceed-

ings.[5] If the law to be applied by the bankruptcy court was clear and the monetary amount of plaintiffs' damages could be reasonably ascertained through the presentation of factual evidence in the malpractice action, then plaintiffs' settlement of this matter without receiving an actual bankruptcy court determination would not have been a bar to their malpractice action. Here, however, the factual determination of the damage amount could not be made until the question of law was resolved as to whether in 1989 the Bankruptcy Code would have required inclusion or exclusion of the plaintiffs' ERISA-qualified pension plan in their bankruptcy estate. (See *Wright v. Chicago Municipal Employees' Credit Union* (1994), 265 Ill. App. 3d 1110, 639 N.E.2d 203 (construction of statute is a matter of law); see also *Hiles v. Norfolk & Western Ry. Co.* (1994), 268 Ill. App. 3d 561, 644 N.E.2d 508; *Weiss v. Village of Downers Grove* (1992), 225 Ill. App. 3d 466, 588 N.E.2d 435; *Golden Bear Family Restaurants, Inc. v. Murray* (1986), 144 Ill. App. 3d 616, 494 N.E.2d 581 (under supremacy clause of United States Constitution, State court considering Federal claim must apply Federal case law to the claim).) Due to the conflicting case law on that issue, the plaintiffs could not establish with any degree of certainty that they would have lost their pension funds had they filed a petition for bankruptcy in 1989.

As noted above, in 1989, when the plaintiffs' alleged damages accrued, as well as in 1984, when the alleged erroneous advice was given to the plaintiffs, bankruptcy law on the issue of whether a debtor's interest in an ERISA-qualified pension plan was to be included or excluded from his estate was unsettled. It is unclear what any judge sitting in the United States Bankruptcy Court for the Northern District would have held as to that issue since neither the United States Supreme Court nor the United States Court of Appeals

---

[5]In a malpractice action, premised on an attorney's failure to advise of foreseeable risks, damages include all losses proximately caused by failure. See *Greycas, Inc. v. Proud* (7th Cir. 1987), 826 F.2d 1560, 1568 (where attorney breached duty of care by negligently misrepresenting that collateral to secure loan had no prior liens, damages were not just value of collateral but the entire uncollectible portion of the loan together with interest that the loan proceeds would have earned in alternative use); *Gruse v. Belline* (1985), 138 Ill. App. 3d 689, 486 N.E.2d 398 (damages resulting from attorney's failure to advise client of contingency clause in real estate contract included judgments entered against client for breach of the real estate contract and client's loss of earnest money required by contract); *York v. Stiefel* (1983), 99 Ill. 2d 312, 458 N.E.2d 488 (where attorney negligently advised client to personally guarantee loan, damages to client was the debt the client assumed).

for the Seventh Circuit had ruled on that issue at those times. (See *In re West* (N.D. Ill. 1993), 157 Bankr. 626, *aff'd* (7th Cir. 1994), 22 F.3d 775; *Shakman v. Democratic Organization* (N.D. Ill. 1972), 356 F. Supp. 1241 (it is the duty of a district court to follow the precedents of its circuit court of appeals); *Dungey v. United States Steel Corp.* (1986), 148 Ill. App. 3d 484, 499 N.E.2d 545 (United States district courts sitting in Illinois are bound to follow the seventh circuit, there being no contrary holding by the United States Supreme Court).) While one judge in the United States Bankruptcy Court for the Northern District of Illinois held that ERISA-qualified pension plans were includable in the debtor's estate (*In re Di Piazza*, 29 Bankr. 916), other judges sitting in the district were not bound by that holding and could reach a contrary conclusion. (See *Hurley v. Gaertner* (N.D. Ill. 1993), 158 Bankr. 115 (bankruptcy court in northern district of Illinois not bound by decisions of its sister court in that district or other districts of that circuit).) As discussed extensively in *In re Shattuc Cable Corp.* (N.D. Ill. 1992), 138 Bankr. 557:

> "Under the principle of *stare decisis*, inferior or lower courts are bound to follow the decisions of superior courts. This fundamental premise is the very basis of our judicial system and is inseparably linked to the hierarchial structure of the federal courts. [Citation.] Under this hierarchy, it is clear that all American courts, state and federal, are bound by the decisions of the Supreme Court of the United States on questions of federal law since the \*\*\* court of appeals is a higher court. As higher courts, the Supreme Court and the courts of appeal exercise appellate jurisdiction over all other courts to develop a uniform body of precedent and law. \*\*\*
>
> Under this rationale, however, it is not clear whether a bankruptcy court is bound by decisions of the district courts in that district. The district court is not a higher court in the same sense that the courts of appeal and the Supreme Court are higher courts, even though it exercises appellate jurisdiction over the bankruptcy courts. The unique structure of the bankruptcy court system makes it a unit of the district court rather than a lower court. The bankruptcy courts are therefore not bound to follow the decision of a single district court judge in a multi-judge district when they disagree with the reasoning and conclusions expressed therein." 138 Bankr. at 565.

Accord *Volpert v. Ellis* (N.D. Ill. 1995), 177 Bankr. 81, *aff'd* (N.D. Ill. 1995), 186 Bankr. 240.

It is true that where the court of appeals within a given circuit, and the United States Supreme Court, are silent on a particular issue, the district courts within that circuit should defer to consistent precedents in other courts of appeal. (*United States v. Bailin* (N.D.

Ill. 1993), 816 F. Supp. 1269; *cf. Colby v. J.C. Penney Co.* (7th Cir. 1987), 811 F.2d 1119 (district courts should give deference to other circuit court of appeals decisions when their circuit is silent but not to other district courts sitting in other circuits); *Taborski v. United States IRS* (N.D. Ill. 1992), 141 Bankr. 959.) Here, however, as noted, the Seventh Circuit Court of Appeals did not pass on this question, and the precedents established by other courts of appeal were not consistent, thereby making it impossible to predict with any degree of certainty what the bankruptcy court would have ruled and to which, if any, circuit court of appeals decisions it would have deferred. Thus, in view of the lack of any binding Federal decisional law, the trial court in the case at bar would have been required to indulge in pure speculation in predicting how the bankruptcy court would have resolved the legal question as to whether the plaintiffs' pension funds were protected from creditors' claims in bankruptcy.

While every legal malpractice case requiring proof of the "case within the case" deals in some degree of speculation as to what the damages in the underlying claim would have been absent the attorney misconduct, the speculation required here is overwhelming. Added to the trial court's quandary was the fact that the court would not be called upon to ascertain the correct rule of law to be applied (as subsequently determined by the United States Supreme Court in *Patterson v. Shumate* (1992), 504 U.S. 753, 119 L. Ed. 2d 519, 112 S. Ct. 2242)) but, rather, to predict how a bankruptcy court judge would have viewed the law in light of existent conflicting and nonbinding case law. Ordinarily, in attempting to determine what law a particular court would have followed, it would be sufficient to determine what the correct law is. In other words, it could ordinarily be presumed that what would be followed would be the correct law. However, in the case *sub judice*, we are asked not to make such a presumption but to determine whether the bankruptcy court in our venue would have aligned itself with the decisions of its sister courts in *In re Di Piazza* and *In re Dagnall*, characterized as the majority view (see *In re Dagnall*, 78 Bankr. 531), and adopted the statutory interpretation ultimately repudiated by the United States Supreme Court in *Patterson*. Since the Supreme Court later determined that an ERISA-qualified pension plan, such as that of the plaintiffs, was entitled to protection from creditors in bankruptcy, we would be called upon to speculate whether the bankruptcy court in this venue would have nevertheless followed a line of interpretation which the Supreme Court ultimately found to be erroneous. We are not being asked to make a legal determination of what the law is; rather, we are being asked to make what is in effect a factual prediction as to

what a particular court would have done notwithstanding the ultimate determination of what it correctly should have done. Such speculation, aside from its clear uncertainty in this case, is not of a kind that this court should invite or engage in. Thus, since it can be said that, as a matter of law, the plaintiffs could not establish with any reasonable degree of certainty that their pension funds would have been subjected to their creditors' claims had they filed a petition for bankruptcy in 1989, the plaintiffs could not prove actual damages; and the grant of summary judgment to the defendants was correct.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNULTY and T. O'BRIEN, JJ., concur.